# EXHIBIT 1

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 2 of 53 PageID #: 9

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

| | |
|---|---|
| JONATHAN KRASNER, individually and on behalf of all others similarly situated, | Index No.: |
| Plaintiffs, | |
| v. | **SUMMONS** |
| CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABRAHAM EISENSTAT, STEVEN G. ROGERS, SABRINA L. KANNER, DARCY D. MORRIS, RICHARD H. ROSS, SHARON STERN, and WHEELER REAL ESTATE INVESTMENT TRUST, INC., | |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned and required to serve upon Plaintiff's attorneys an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Venue is designated in Nassau County because Defendant Cedar Realty Trust, Inc. maintains its principal executive office in this County and a substantial portion of the transaction and wrongs complained of herein occurred in this County.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                      RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 3 of 53 PageID #: 10

Dated: October 14, 2022

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**

Michael J. Palestina
Brian C. Mears
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
T: (504) 455-1400
F: (504) 455-1498
Email: michael.palestina@ksfcounsel.com
         brian.mears@ksfcounsel.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

  /s/ Juan E. Monteverde
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com
          mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

| | |
|---|---|
| JONATHAN KRASNER, individually and on behalf of all others similarly situated, | Index No.: |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABRAHAM EISENSTAT, STEVEN G. ROGERS, SABRINA L. KANNER, DARCY D. MORRIS, RICHARD H. ROSS, SHARON STERN, and WHEELER REAL ESTATE INVESTMENT TRUST, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Jonathan Krasner ("Plaintiff"), by his undersigned attorneys, brings this Complaint on behalf of himself and the holders of the Preferred Stock (defined below) of Cedar Realty Trust, Inc. ("Cedar" or the "Company") against (1) Cedar, Cedar's CEO Bruce J. Schanzer, and the members of Cedar's board of directors (collectively, the "Board" or "Individual Defendants") for breach of contract and breaches of fiduciary duties, and (2) Wheeler Real Estate Investment Trust, Inc. ("Wheeler", and, together with Cedar and the Board, the "Defendants") for tortiously interfering with Preferred Stockholders' (defined below) contractual rights and aiding and abetting the above-described breaches, all in connection with Defendants' bad faith actions in orchestrating a scheme to deprive the Preferred Stockholders of a Liquidation Preference (defined below) and Conversion Right (defined below) entitled to them as set forth in the articles

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

supplementary governing the terms of their Cedar Preferred Stock ("Articles Supplementary").[1]

This scheme involved a series of transactions through which Cedar (i) sold all of its properties to third parties for over $1 billion and distributed the net proceeds from those sales *exclusively* to the Company's common shareholders, and (ii) transferred control over the payment of future Preferred Stock dividends to Wheeler, a company with a history of underperformance, dysfunctional management, and oppression of its own preferred shareholders.

To remedy Defendants' wrongdoing, this action seeks an order awarding Plaintiff and the Class (as defined herein) damages suffered as a result of Defendants' wrongdoing. The allegations of this Complaint are based on Plaintiff's knowledge as to himself, and on information and belief based upon, among other things, the investigation of counsel and certain publicly available information, as to all other matters.

## SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of the Preferred Stockholders of Cedar against Defendants for breach of contract, breaches of fiduciary duty, and/or other violations of state law.

2.      Cedar was a publicly traded real estate investment trust ("REIT"). The Company's capitalization consisted of (i) common stock, (ii) Cedar 6.50% Series C Preferred Stock ("Series C Preferred Stock"), and (iii) Cedar 7.25% Series B Preferred Stock ("Series B Preferred Stock" and, collectively with the Series C Preferred Stock, the "Preferred Stock," and holders thereof, the "Preferred Stockholders"). The Preferred Stock was governed by the Company's Articles of Incorporation and the Articles Supplementary. Pursuant thereto, the Preferred Stock had a

---

[1]   The terms of the Series B Articles Supplementary are substantively identical to the terms of the Series C Articles Supplementary. Therefore, for ease of reference, this Complaint refers to the sections from the Series C Articles Supplementary.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 6 of 53 PageID #: 13

liquidation value of $25.00 (per share of Preferred Stock), payable upon any liquidation, dissolution, or winding-up of the Company, and a conversion right upon a "change of control."

3.      Since 2017, the Company had been the target of several activist investors. Beginning in 2020, the Board again found itself in the crosshairs of aggressive activists, which were demanding changes to the Company's governance. Fearing a public proxy fight that would impact their professional and financial interests, in 2021, the Board engaged in discussions with the activists, which ultimately lead to the appointment of three new Board members. Thereafter, this newly constituted Board quickly engaged in a review of the Company's strategic alternatives, including an orderly liquidation of the Company's assets, which would have triggered the Liquidation Preference, or a sale of the Company – which would have triggered the Conversion Right.

4.      However, shortly thereafter, the Board began to consider the "possibility of selling assets in large portfolio sales, rather than individually," in an apparent attempt to circumvent the Liquidation Preference and Conversion Right afforded to Preferred Stockholders and garner more compensation for themselves – at the expense of the Preferred Stockholders. In connection therewith, Cedar announced a "dual-track process" to review the Company's strategic alternatives, pursuant to which Cedar would explore, among other alternatives, a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored shopping center portfolio and its mixed-use redevelopment projects.

5.      Ultimately, on March 2, 2022, the Company entered into an *Asset Purchase and Sale Agreement* with DRA Fund X-B LLC[2] and KPR Centers LLC and their respective designees

---

[2]      DRA Growth and Income Master Fund X-B, LLC and DRA Fund X-B LLC are Funds managed by DRA Advisors LLC ("DRA" or "DRA Advisors"), a New York-based registered investment advisor.

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(the "Grocery Anchored Purchasers"), pursuant to which the Company agreed to sell to the Grocery Anchored Purchasers a portfolio of 33 grocery-anchored shopping centers for a cash purchase price of $840.0 million, less the outstanding principal balance of any assumed mortgage debt (the "Grocery-Anchored Portfolio Sale").

6.      Also on March 2, 2022, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Wheeler (and Wheeler's affiliates), pursuant to which Wheeler would acquire the balance of the Company's shopping center assets (the "Wheeler Properties") via an all-cash merger transaction between the Company and a Wheeler subsidiary, and that purportedly valued the remaining portfolio at $291.3 million (the "Wheeler Merger" and together with the Grocery-Anchored Portfolio Sale, the "Transactions").[3] As discussed below, it appears that the $291.3 million purported value of the Wheeler Properties was misleadingly inflated.

7.      In connection with the Transactions, the Company announced that it would return **to the holders of Company common stock** an amount in cash equal to an aggregate of approximately $29.00 per share of common stock.  Specifically:

a)      Prior to the consummation of the Wheeler Merger, the Board intended to declare one or more special dividends (the "Closing Dividend") payable to

---

[3]      Specifically, the parties to the Merger Agreement were Cedar, Wheeler, WHLR Merger Sub Inc., a wholly owned subsidiary of Wheeler ("Merger Sub I"), WHLR OP Merger Sub LLC, a wholly owned subsidiary of Merger Sub I, and Cedar Realty Trust Partnership, L.P., the operating partnership of Cedar ("Cedar OP"). Pursuant to the Merger Agreement, on the closing date, Merger Sub II merged with and into Cedar OP, with Cedar OP being the surviving limited partnership resulting from such merger, and immediately following such merger, Merger Sub I merged with and into Cedar, with Cedar being the surviving company (the "Surviving Company") resulting from such merger. Pursuant to the terms of the Merger agreement, the Preferred Stock would remain outstanding. The Company's filings indicated that "[t]his post-closing structure whereby the Company Preferred Stock [would] remain outstanding preferred securities of an independent public reporting entity that holds a significant retained portfolio of income-producing assets [wa]s **intended to facilitate the undisrupted ability of the Surviving Company to pay all required dividends on the Company Preferred Stock** in accordance with the articles supplementary governing the terms of the Company Preferred Stock and applicable law."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 8 of 53 PageID #: 15

record holders of the Company's common stock and common units of limited partnership interest in Cedar OP ("OP Units") in an aggregate amount equal to the net proceeds available for distribution from all prior sales of assets by the Company and its subsidiaries, including the Grocery-Anchored Portfolio Sale, and, to the extent two of the Company's redevelopment projects had not been separately sold to third parties, the Grocery-Anchored Portfolio Sale would also include the acquisition by the Grocery-Anchored Purchasers of the redevelopment assets for an additional aggregate purchase price of up to $80.5 million; and

b)    In connection with consummation of the Wheeler Merger, each share of Company common stock and each OP Unit issued and outstanding immediately prior to the effective time of the Wheeler Merger would be converted into the right to receive cash merger consideration (the "merger consideration") in an amount equal to $130.0 million divided by the total number of outstanding shares of Company common stock and OP Units.

8.     Notably, in connection with the Wheeler Merger agreement, on March 2, 2022, Wheeler obtained a $130 million debt financing commitment from KeyBank National Association ("Keybank") "to enable Wheeler to consummate the [Wheeler Merger] and make payments required under and in connection with the [Wheeler Merger]."

9.     In connection with the Transactions, on April 21, 2022, the Company filed a Schedule 14A Proxy Statement (the "Proxy") encouraging the Company's common shareholders to vote in favor of the proposed Transactions at its May 27, 2022 special meeting.

10.    On May 27, 2022, Cedar's common stockholders voted in favor of the

5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Transactions. **The Company's Preferred Stock did not have voting rights on the Transactions.**

11.     On July 7, 2022, the Company completed the Grocery-Anchored Portfolio Sale (including the redevelopment assets) for gross proceeds of approximately $879 million, including the assumed debt.

12.     On August 9, 2022, Cedar's Board declared the $29.00 per share Closing Dividend to be paid to the Company's common shareholders.

13.     In connection with the consummation of the Wheeler Merger, on August 22, 2022, Wheeler caused Cedar OP, as borrower, to enter into a loan agreement with Keybank for a $130 million term loan (the "Loan"). **The Loan has a maturity date of August 22, 2023. Also on August 22, 2022, Cedar and Wheeler, as Guarantor and a Subsidiary Guarantor, respectively, entered into a Guaranty of the obligations of Cedar OP, borrower, under the Loan. It appears that the Loan is collateralized by the Wheeler Properties.** Accordingly, any default under the Loan will be borne by the Preferred Stockholders. Notably, the Wheeler Properties generated net operating income of approximately $19.1 million in 2021, and it therefore strains credulity that the Wheeler Properties will generate sufficient operating income to cover the $130 million Loan principal and interest at maturity as well as the Preferred Stock dividends.

14.     As described in detail below, the Board structured the Transactions such that the Company would effectively (i) cease all meaningful operations, terminate all of its officers, employees, and the Board, sell off the Company's most lucrative assets; (ii) use those proceeds to retire the Company's debt and pay its common shareholders, which included the Individual Defendants; and (iii) transfer control of the Company's Preferred Shares to Wheeler – **a company with its own history of underperformance, dividend payment instability, and oppression of preferred stockholders – in a deliberate and bad-faith attempt to deprive Preferred**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Stockholders of their Liquidation Preference and Conversion Right.

15.     In so doing, Defendants breached their contractual obligations and fiduciary duties with respect to Plaintiff and the other members of the Class. The Defendants orchestrated the Transactions to benefit holders of the Company's common stock – which included the Individual Defendants – to the exclusion of the Company's Preferred Shareholders.

16.     For its part, Wheeler aided and abetted in Defendants' breaches of fiduciary duty and tortiously interfered with the Preferred Shareholders' contractual rights under the Articles Supplementary.  Wheeler knew of the Preferred Shareholders' contractual rights under the Articles Supplementary and knew that the Board owed fiduciary duties to the Preferred Shareholders, yet it actively cooperated with the Board to structure the transactions with the intent of enriching Defendants at the expense of the Preferred Stockholders (including by arranging for the Keybank Loan – guaranteed by Cedar, Cedar OP, and Wheeler – that financed the $130 million distribution to Cedar's common stockholders, including the Individual Defendants).

17.     For these reasons, and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Defendants' actions.

## PARTIES

18.     Plaintiff was, and had been continuously throughout all times relevant hereto, an owner of the Company's Series C Preferred Stock. Plaintiff is a citizen and resident of Maryland.

19.     Defendant Bruce J. Schanzer ("Schanzer") was, at all relevant times, the President, Chief Executive Officer, and director of Cedar since 2011. As of April 18, 2022, Schanzer beneficially owned approximately 380,687 shares of Cedar common stock. In connection with the Transactions, Schanzer stood to earn approximately $30.9 million in cash severance payments, deferred compensation, and accelerated equity awards.

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

20.     Defendant Gregg A. Gonsalves ("Gonsalves") was, at all relevant times, a director of Cedar since 2017 and became Chairman in 2021. As of April 18, 2022, Gonsalves beneficially owned approximately 18,626 shares of Cedar common stock.

21.     Defendant Abraham Eisenstat ("Eisenstat") was, at all relevant times, a director of Cedar since 2015. As of April 18, 2022, Eisenstat beneficially owned 41,829 shares of Cedar common stock.

22.     Defendant Steven G. Rogers ("Rogers") was, at all relevant times, a director of Cedar since 2016. As of April 18, 2022, Rogers beneficially owned 19,746 shares of Cedar common stock.[4]

23.     Defendant Sabrina Kanner ("Kanner") was, at all relevant times, a director of Cedar since June 2018. As of April 18, 2022, Kanner beneficially owned 16,987 shares of Cedar common stock.

24.     Defendant Darcy Morris ("Morris"), was, at all relevant times, a director of Cedar since April 2021. Morris founded the firm Ewing Morris & Co. Investment Partners ("Ewing Morris"), and was first appointed to the Board on April 28, 2021 pursuant to a Cooperation Agreement with Cedar following Ewing Morris' activist campaign against the Board. As of April 18, 2022, Ewing Morris owned 1,103,277 shares of Cedar common stock, representing approximately 8.09% of Cedar's common stock.

25.     Defendant Richard H. Ross ("Ross") was, at all relevant times, a director of Cedar, and was one of the nominees on a slate of directors put forward by Camac Partners, LLC ("Camac") on or about March 1, 2021. Ross was appointed to the Board on April 28, 2021 pursuant to a Cooperation Agreement with Cedar following Camac's activist campaign against the Board.

---

[4]     Pleadings in other litigation involving the Company indicate that Rogers owned 449 shares of Cedar Series B Preferred Stock.

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

As of April 18, 2022, Camac owned 1,274,846 shares of Cedar common stock, representing approximately 9.35% of Cedar's common stock.

26.     Defendant Sharon Stern ("Stern") was, at all relevant times, a director of Cedar, and was one of the nominees on the slate of directors put forward by Camac on or about March 1, 2021. Stern was appointed to the Board on April 28, 2021 pursuant to pursuant to a Cooperation Agreement with Cedar following Camac's activist campaign against the Board.

27.     Defendant Cedar Realty Trust, Inc. (previously defined as "Cedar") is a Maryland corporation with its principal place of business in Massapequa, New York. Prior to the Merger, Cedar was a REIT that focused primarily on ownership, operation, and redevelopment of grocery-anchored shopping centers in high-density urban markets.

28.     Defendant Wheeler Real Estate Investment Trust, Inc. (previously "Wheeler") is a Maryland REIT with its principal place of business in Virginia Beach, Virginia.

29.     Defendants identified in paragraphs 19 to 26 constitute the Board and/or the Individual Defendants.

## JURISDICTION AND VENUE

30.     This Court has personal jurisdiction over Cedar and the Board because Cedar was headquartered in Massapequa, New York. As a result, each of the Individual Defendants had sufficient contacts with New York as a director and/or officer of a company headquartered in New York, which makes the exercise of personal jurisdiction over them proper under traditional notions of fair play and substantial justice.  *See* N.Y. C.P.L.R. §§ 301, 302(a).

31.     This Court has personal jurisdiction over Wheeler because Wheeler transacted business within New York and committed a tortious act causing injury to persons within this state, as several Preferred Stockholders were undoubtedly New York residents. *See* N.Y. C.P.L.R. §

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

11 of 52

302(a). Indeed, Wheeler effectuated the Transactions at issue with Cedar and the Board, which were based in New York.

32.     Venue is proper in this Court because Cedar was headquartered in this County and a substantial portion of the occurrences and wrongdoing complained of herein occurred in this County.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

33.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they were in a fiduciary relationship with Plaintiff and the other public Preferred Shareholders of Cedar and, pursuant to Md. Corps. & Ass'ns Code § 2-405.1 and common law, owed Plaintiff and the other members of the Class (defined below) the duties of loyalty, good faith, and due care.

34.     By virtue of their positions as directors and/or officers of Cedar, the Individual Defendants, at all relevant times, had the power to control and influence Cedar, did control and influence Cedar, and caused Cedar to engage in the practices complained of herein.

35.     Under Maryland law, each of the Individual Defendants was required to act in good faith, with due care, and in the best interests of the Company's stockholders.  To diligently comply with these duties, the directors of a corporation may not take any action that benefits one class of stockholders at the obvious expense of another.

36.     In accordance with the Board's fiduciary duties, the Defendants, as officers and/or directors of Cedar, were obligated to refrain from:

a.     participating in any transaction where the officers' or directors' loyalties are divided;

b.     participating in any transaction where the officers or directors receive, or are entitled to receive, a personal financial benefit not equally shared by

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

Case 2:22-cv-06945-DLI-JMW    Document 1-1    Filed 11/14/22    Page 14 of 53 PageID #: 21

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 10/14/2022

the public stockholders of the corporation; and/or

    c.      unjustly enriching themselves at the expense or to the detriment of the public stockholders.

37.    Further, Defendants had a duty to act with the utmost loyalty and good faith to the Company's public stockholders in connection with a sale of the Company.

## SUBSTANTIVE ALLEGATIONS

**I.**    **Relevant Corporate Background and Terms of the Articles Supplementary**

38.    Cedar was a publicly traded REIT focused on the ownership, operation, and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington D.C. to Boston.

39.    Cedar owned 99.4% of Cedar Realty Trust Partnership L.P. (previously "Cedar OP," or alternatively the "Operating Partnership"). Cedar OP was a Delaware limited partnership, with its primary place of business in Port Washington, New York. Virtually all of Cedar's assets were owned by, and nearly all business was conducted through, the Operating Partnership.

40.    As of December 31, 2020, Cedar had three classes of stock issued and outstanding: 13,658,437 shares of common stock; 1,450,000 shares of Series B Preferred Stock; and 5,000,000 shares of Series C Preferred Stock.

41.    The Preferred Stock were governed by the Company's Articles of Incorporation and the Articles Supplementary. Pursuant to Section 2 of the Articles Supplementary, the Preferred Stock:

> [w]ill with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series C Preferred Stock; (b) on parity with the Series B Preferred Stock (as defined in the Charter) and with all equity securities issued by the Corporation the terms of which specifically

11

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

provide that such equity securities rank on parity with the Series C Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series C Preferred Stock. The term "equity securities" shall not include convertible debt securities.

42.     Pursuant to Section 4 of the Articles Supplementary, titled "Liquidation Preference," the Preferred Stock had a liquidation value of $25.00 per share of Preferred Stock (plus any accrued and unpaid dividends), payable upon any voluntary or involuntary liquidation, dissolution, or winding up of the Company (the "Liquidation Preference"). The full text of Section 4 provides:

(a) In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (referred to herein sometimes as a "liquidation"), the holders of Series C Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any accrued and unpaid dividends (whether or not declared) to the date of payment, before any distribution of assets is made to holders of Common Stock (as defined in the Charter) or any equity securities that the Corporation may issue that rank junior to the Series C Preferred Stock as to liquidation rights.

(b) If, upon any such voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the assets of the Corporation are insufficient to make full payment to holders of the Series C Preferred Stock, the Series B Preferred Stock, and any shares of other classes or series of equity securities of the Corporation ranking on parity with the Series C Preferred Stock as to liquidation rights, then the holders of the Series C Preferred Stock, the Series B Preferred Stock, and all other such classes or series of equity securities ranking on parity with the Series C Preferred Stock as to liquidation rights shall share ratably in any distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(c) Written notice of any such liquidation, dissolution or winding up of the Corporation, stating the payment date or dates when, and the place or places where, the amounts distributable in such circumstances shall be payable, shall be given by first class mail, postage pre-paid, not less than 30 nor more than 60 calendar days immediately preceding the payment date stated therein, to each record holder of the Series C Preferred Stock at the respective addresses of such holders as the same shall appear on the share transfer records of the Corporation.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1     RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 16 of 53 PageID #: 23

(d) After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series C Preferred Stock shall have no right or claim to any of the remaining assets of the Corporation.

(e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the Corporation.

(f) In determining whether a distribution (other than upon voluntary or involuntary dissolution) by dividend, redemption or other acquisition of shares of the Corporation or otherwise is permitted under Maryland law, amounts that would be needed, if the Corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of the holders of Series C Preferred Stock will not be added to the Corporation's total liabilities.

43.     The Articles Supplementary do not define the meaning of the terms "liquidation," "dissolution" or "winding up of the Corporation." As such, there is ambiguity as to what transactions qualify as such pursuant to Section 4(a) and what transactions will not qualify as a "liquidation" pursuant to Section 4(e).

44.     Section 4(a) applies to "any voluntary or involuntary liquidation, dissolution or winding up of the Corporation," and Section 4(e) only carves out mergers or asset sales that *do not feature characteristics of a liquidation* from Section 4(a).

45.     At best for Defendants, in the absence of a definition of "liquidation," Sections 4(a) and 4(e) – when read together as they must be – are ambiguous. As such, they must be construed against the party that drafted them (Cedar and the Board), and Section 4(e) must be interpreted as inapplicable to the Transactions at issue, which feature the characteristics of a liquidation. The Transactions qualified as a "liquidation" and "winding up" under Section 4(a) of the Articles Supplementary, and triggered the obligation to pay the Liquidation Preference in full to Preferred Stockholders before distributing any of the net proceeds from the Transactions to common

13

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

stockholders.

46.    Pursuant to Section 5 of the Articles Supplementary,[5] titled "Redemption," "[u]pon the occurrence of a Change of Control (as defined below), the [Company], at its option, upon giving notice as provided below, may redeem the Series C Preferred Stock, in whole or in part, within 120 days after the first date on which such Change of Control occurred, at a redemption price of $25.00 per share, plus all accrued and unpaid dividends[.]" (the "Redemption Right").

47.    Pursuant to Section 7 of the Articles Supplementary, titled "Conversion,"

[u]pon the occurrence of a Change of Control…, each holder of Series C Preferred Stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the [Company] has provided or provides notice of its election to redeem the [] Preferred Stock pursuant to the Redemption Right, to convert some or all of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock . . ."

(the "Conversion Right").

48.    The Articles Supplementary defined "Change of Control," for the purposes of Section 5 and Section 7 as

(x) the acquisition by any person, … of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the [Company] entitling that person to exercise more than 50% of the total voting power of all shares of the [Company] entitled to vote generally in elections of directors … and (y) following the closing of any transaction referred to in clause (x), neither the [Company] nor the acquiring or surviving entity has a class of common securities (or American Depositary Receipts ("ADRs") representing such securities) listed on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ"), or listed or quoted on an exchange or quotation system that is successor to the NYSE, the NYSE American or NASDAQ (each individually, a "National Market," and collectively, the "National Markets");

---

[5]    Specifically, the Articles Supplementary to the Articles of Incorporation of Cedar for the Company's 6.50% Series C Cumulative Redeemable Preferred Stock, filed as Exhibit 3.1 of Form 8-K filed on December 15, 2017.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

14

49.    Finally, the Articles Supplementary provided that

So long as any Series C Preferred Stock remains outstanding, the [Company] shall not, **without the affirmative vote or consent of the holders of at least two-thirds of the Series C Preferred Stock outstanding at the time**, given in person or by proxy, either in writing or at a meeting (such series voting separately as a class): … (ii) amend, alter or repeal the provisions of the Charter (including these Articles Supplementary), whether by merger or consolidation (in either case, an "Event") or otherwise, so as to **materially and adversely affect any right, preference, privilege or voting power of the Series C Preferred Stock**; provided, however, that with respect to the occurrence of any Event, the occurrence of any such event will not be deemed to materially and adversely affect any right, preference, privilege or voting power of the Series C Preferred Stock or the holders thereof so long as the Series C Preferred Stock remains outstanding with the terms thereof materially unchanged, or, if the [Company] is not the surviving entity in such transaction, the Series C Preferred Stock is exchanged for a security of the surviving entity with terms that are materially the same as the Series C Preferred Stock; and provided further that any increase in the amount of authorized Series C Preferred Stock or the creation or issuance of or increase in the amount of any other class or series of the Corporation's equity securities, in each case ranking on parity with or junior to the Series C Preferred Stock with respect to the payment of dividends and the distribution of assets upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation, shall not be deemed to materially and adversely affect the rights, preferences, privileges or voting powers of the Series C Preferred Stock.

50.    The Prospectus for the Series C Preferred Stock provided:

**The Series C Preferred Stock is subordinated to existing and future debt, and your interests could be diluted by the issuance of additional shares of preferred stock and by other transactions.**

*** 

Other than the limited conversion right afforded to holders of the Series C Preferred Stock that may occur in connection with a Change of Control as described in this prospectus supplement under the caption "Description of the Series C Preferred Stock—Conversion Rights," none of the provisions or terms of the Series C Preferred Stock relate to or limit our ability to incur additional indebtedness or afford the holders of the Series C Preferred Stock protection in the event of a highly leveraged or other transaction, including a merger or the sale, lease or conveyance of all or substantially all our assets, that might adversely affect the rights of the holders of Series C Preferred Stock, **so long as the rights of the holders of Series C Preferred Stock are not materially and adversely affected.**

51.    The Prospectus for the Series C Preferred Stock likewise provided that Holders of

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                            RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 19 of 53 PageID #: 26

Series C Preferred Stock have no voting rights, except

> **the affirmative vote of the holders of at least two-thirds of the outstanding Series C Preferred Stock (voting as a separate class) is required for us** to authorize, create or increase the authorized or issued amount of any class or series of our equity securities ranking senior to the outstanding Series C Preferred Stock as to dividends and amounts upon liquidation or **to amend our charter (whether by merger, consolidation or otherwise), in a manner that materially and adversely affects the rights of the holders of the Series C Preferred Stock, unless the Series C Preferred Stock remains outstanding with its terms materially unchanged or, if the Corporation is not the surviving entity, the Series C Preferred Stock is exchanged for a security of the surviving entity with terms that are materially the same as the Series C Preferred Stock.**

52. As discussed below, the Board structured the Transactions **to deliberately deprive Preferred Stockholders of their Liquidation Preference and Conversion Right** and resulted in their **rights being materially and adversely affected**.

**II.      Events Leading to the Transactions**

53. In September 2017, it was reported that activist hedge fund Snow Park Capital Partners LP ("Snow Park") had focused its attention on Cedar and urged it to explore strategic alternatives, including a sale. Shortly thereafter, in October 2017, Snow Park – then an owner of approximately 3.5% of the Company's outstanding common stock – sent a letter to the Board, urging the Board to explore all strategic options, including a sale of the Company or liquidation of its assets, and to publicly communicate its strategy to shareholders. Notably, Snow Park was very critical of Cedar's management and governance:

> Thank you for allowing us to voice some of our views in an introductory call on October 9th. While we are encouraged that the Board has at least taken an initial step to listen to shareholder concerns, we **remain concerned that the Board may not have learned from some of its prior missteps and is on a course that will perpetuate the Company's consistent track record of underperformance**. As the owner of approximately 3.5% of Cedar's outstanding shares, we believe that Cedar can do more to create value for all of its investors.

> …Snow Park has communicated with multiple firms, both financial and strategic, that have specifically expressed interest in Cedar's portfolio. Many of these parties

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

have either formally or informally reached out to the Company, only to be rebuffed. **Cedar's lack of willingness to even entertain a market check on the Company's assets has left shareholders suffering in an inefficient and underperforming REIT with very little hope that Cedar's discount to private market value will ever be closed.**

\*\*\*

Furthermore, we do not find credible management's claims that the "next leg of value creation" will come from the high-risk, mixed-use developments that it has described only in abstract terms and for which the Company has no core competence or identifiable experience. . . . **We believe that management's claims are nothing more than an attempt to obfuscate their performance and garner another seven years to earn compensation packages more typically seen at Fortune 500 companies or professional athletic teams rather than tiny, subscale REITs.**

We are also disappointed in the **Board's proclivity to enter into agreements that have made a small group of insiders wealthy.** For over 14 years, insiders have consistently over-promised and under-delivered while shareholders have continued to suffer in the highly inefficient structure of Cedar. . . . **Simply stated, while the Company owns desirable and eminently salable assets, but unfortunately for shareholders these assets are hopelessly trapped in a flawed and inefficient structure that has done nothing more than transfer value to insiders since 2003.**

In fact, since 2011, cumulative compensation to just the top two executives and the Board will have totaled over $40 million by the time Mr. Schanzer's contract expires in June 2018, compared to a market capitalization of only $350 million at the time his contract was entered into in June 2011.[] Snow Park is not alone in its concerns regarding the Company's compensation. . . .

\*\*\*

… it is clear that now is the time for the Board to finally put an end to long-lasting shareholder suffering and explore all alternatives to enable shareholders to salvage the value of the Company's real estate which is worth significantly more than the current trading price of $5.56 per share.

Snow Park concluded by noting that it would "not hesitate to take any action that [it] believe[d] necessary to protect shareholders' best interests, including nominating a slate of independent director candidates for election at the 2018 Annual Meeting."

54.     Shortly thereafter, on November 27, 2017, it was reported that Cedar's Board had

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 21 of 53 PageID #: 28

rejected an unsolicited proposal from Wheeler – which the Board believed had been encouraged by Snow Park.  In a November 26, 2017 letter to Wheeler, the Board provided several factors that were considered in finding "sincere reservations" as to whether an acquisition by Wheeler "could possibly create value for Cedar shareholders," including: (i) Wheeler's underperformance with respect to returns and financial performance, (ii) Wheeler's uncertain dividend sustainability, (iii) Wheeler's lower quality portfolio, (iv) Wheeler's balance sheet appearing over-leveraged, with debt to EBITDA of nearly 10 times, and (v) the companies' incompatible size, with Cedar being a $1.35 billion company with a current equity market capitalization of $550 million, and Wheeler being a $375 million company with a current equity market capitalization of $95 million. Notably, Cedar closed this letter by remarking that it "wonder[ed] how Snow Park or any well-intentioned Cedar shareholder could possibly think that a transaction of this nature would be in the long-term best interest of Cedar and its shareholders."

55.    However, a report the following day suggested that Wheeler would continue its overtures:

> A combination of Wheeler Real Estate Investment Trust Inc. and Cedar Realty Trust Inc. is off the table for now, but the former's CEO vowed to revisit the prospect in the coming weeks and months, after the dust has settled.
>
> **Relations between the two companies after a very brief, failed courtship appear to be cool**. In an interview, Wheeler REIT's chairman and CEO, Jon Wheeler, said he was disappointed and surprised by the Cedar Realty board's outright rejection of his approach, which Cedar interpreted as an "unsolicited and unrealistic" merger proposal.
>
> ***
>
> "It was really just a 40,000-foot-level, 'Let's get together and talk about alternatives for the benefit of both of our shareholders,'" Wheeler said. Wheeler REIT has not made public the letter that it sent initially to Cedar Realty's board, but **Wheeler described it as a "genuine" appeal to discuss avenues for enhancing shareholder value — avenues that could include "a relationship, an alliance or**

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

20 of 52

**an acquisition," he said — rather than a hostile or "activist" play.** No formal offer detailing financial terms and specifying managerial changes was made, he said.

Cedar Realty also is fending off an activist campaign by hedge fund Snow Park Capital Partners LP and grappling with a sexual harassment lawsuit against CEO Bruce Schanzer by the company's former COO. Cedar Realty's leadership declined requests for comment, but a spokesperson characterized Wheeler REIT's overtures as more aggressive than did Wheeler. "The letter made abundantly clear that the transaction under consideration was an acquisition of Cedar by Wheeler REIT, and left no room for any good faith interpretation otherwise," a Cedar spokesperson said in an email.

Cedar Realty and Wheeler REIT also disagree about the extent to which Snow Park, which recently has criticized Cedar Realty's leadership for, among other things, exorbitant executive pay, is pulling the strings.

In its Nov. 27 release, Cedar Realty alleged that Snow Park "encouraged" Wheeler REIT's approach — a claim Wheeler REIT denied. "We're not working with them," Wheeler said of Snow Park. "This is not a collaboration."

***

Wheeler acknowledged that securing and executing a deal of such size would be "laborious" and require substantial time, effort and money. **But he was optimistic about attempting another meeting sometime in the coming weeks or months.**

56.    Then, just a few months later, on February 16, 2018, Cedar announced that it had entered into a cooperation agreement with Snow Park to resolve Snow Park's activist campaign. Pursuant to the agreement, Cedar would "engage a nationally-recognized search firm to identify a new independent director candidate to stand for election to the Company's Board at the 2018 Annual Meeting of Shareholders" to replace former Cedar director Paul Kirk (whose forthcoming retirement Cedar had announced the day before), and Snow Park agreed to vote its shares in support of the nominees that Cedar put forward.

57.    Meanwhile, in early 2018, amidst weak market conditions, Cedar's equity prices tumbled:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 23 of 53 PageID #: 30



58.     Indeed, over the course of 2018 and 2019, the share price of the Company's common stock traded at a material discount to the net asset value of its properties ("NAV") as calculated by the sell-side research analysts covering the Company. For example, during 2018, while the shopping center public REIT sector traded, on average, at a 12% discount to NAV, the Company's share price traded as low as a 55% discount to NAV.  The Company's share price would continue to trade at ever- increasing discounts to NAV, trading down to below $16.00 per share in July 2019, which equated to a 58% discount to NAV.

59.     In July 2019, the Board met to discuss the challenges facing the Company and evaluated various possible paths and strategies, including selling non-core assets (including the sale of the Company redevelopment assets), pursuing larger asset sales in portfolio or company-level transactions, **or seeking to effect a phased liquidation of the Company and all its properties.**

60.     At that meeting, CEO Schanzer indicated to the Board that he was exploring potentially forming an investor group to pursue an acquisition of the Company, and the Board formed a special committee of independent directors to explore strategic alternatives. In August

20

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

2019, the special committee retained BofA Securities, Inc. ("BofA Securities") as the special committee's financial advisor.

61.    In December 2019, Schanzer's investor group proposed to acquire the Company in a merger transaction for $26.40 per share of common stock, of which $23.76 per share would be paid in cash and the balance in shares of the surviving entity in the merger. In response, the special committee instructed BofA Securities to solicit bids from potential counterparties.

62.    In early January 2020, BofA Securities solicited 33 potential counterparties, including other shopping center REITs, private real estate funds, real estate investors and financial sponsors. Twenty-five parties, including Defendant Schanzer's investor group, signed non-disclosure agreements with the Company and received data room access. Over the next several weeks, the Company and its advisors facilitated due diligence and engaged in discussions with these potential counterparties.

63.    By the end of January 2020, the Company had received seven non-binding bids for the Company as a whole and one additional non-binding bid for select assets, ranging in price from $19.80 to approximately $25.00 per share, subject to further due diligence and negotiation of definitive documentation. BofA Securities set a March 27, 2020 deadline for receiving "best and final" bids.

64.    Then, in early March 2020, the COVID-19 pandemic disrupted the global economy and financial markets. In response, the Company drew down $75.0 million under its revolving credit facility and reduced the quarterly common dividend. Moreover, Schanzer advised the special committee that he would no longer participate, directly or indirectly, in any group with respect to a possible transaction with the Company, and the Board disbanded the special committee and ended the formal process of exploring potential strategic alternatives.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 25 of 53 PageID #: 32

65.     By November 2020, the Company again found itself in the crosshairs of activist

investors. On November 6, 2020, Camac filed a Schedule 13D with the SEC disclosing that Camac,

together with the other members of the filing group, possessed shared voting power of 5.1% of the

outstanding Company common stock. The filing stated that Camac intended, among other possible

actions, to review its investment in the Company on a periodic basis and that it may from time to

time engage in communications and discussions with Company management and the Board.

66.     On February 1, 2021, Camac made publicly available a slide presentation titled

"Unlocking Value in Cedar Realty Trust", that, among other things, presented purported

opportunities to "unlock value" at the Company, asserted Camac's belief that the Board needed

refreshment due to perceived Company underperformance; and outlined a strategic plan

formulated by Camac that it said would maximize return on invested capital, preserve cash flow

and improve portfolio quality.  This presentation likewise highlighted a need for "substantial

refreshment" to the Board:

22

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 26 of 53 PageID #: 33

24

# 1. IMPROVE CORPORATE GOVERNANCE

**ISS report**[1] **further supports the board requires substantial refreshment:**

○ Failed to hold management accountable for severe under performance

○ Allowed continued investment into a business plan that has repeatedly failed

○ Too many time-based equity awards creating major misalignment

○ Low-to-almost nonexistent Director ownership i.e. zero skin in the game

○ No shares purchased during pandemic showing no support and faith in management

○ Excessive Director compensation; $750,000+ expense for a company of this size is too much on both an absolute and relative basis

○ Some Directors have been on the board for over a decade, with one on the board almost 20 years i.e. it is time for new voices with fresh perspectives

**Tenured Directors have overseen significant under performance**

(1)  ISS report date May 19, 2020

67.     Meanwhile, according to the Proxy, the Company had likewise been engaged in discussions with representatives of Barington Companies Equity Partners, L.P. ("Barington"). On February 22, 2021, the Company received a legal notice from Barington setting forth Barington's intention to nominate two directors for election at the company's 2021 annual meeting of stockholders. At the time, Barington (and its affiliates) held approximately 363,738 shares, or approximately 2.7%, of Cedar common stock.

68.     On February 26, 2021, Ewing Morris & Co. Investment Partners Ltd (together with certain affiliates, previously defined as "Ewing Morris") filed a Schedule 13D with the SEC disclosing that Ewing Morris, together with the other members of the filing group, possessed shared voting power of 8.1% of the outstanding Company common stock. Among other things,

23

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the filing stated that Ewing Morris was seeking to engage in a dialogue with the Board and Company management about "numerous operational and strategic opportunities to maximize shareholder value." On February 25, 2021, the day prior to the Schedule 13D filing, Ewing Morris had delivered a legal notice to the Company nominating Defendant Morris, Ewing Morris' co-president and chief executive officer, for election to the Board at the Company's 2021 annual meeting of stockholders.

69.     Also on February 26, 2021, the Company received a legal notice from Camac setting forth its intention to replace the Board with Camac's competing slate of seven nominees – including Defendants Ross and Stern – for election to the Board at the Company's 2021 annual meeting of the stockholders. On March 1, 2021, Camac publicly announced that it had formally nominated seven director candidates for election to the Board, including Defendants Ross and Stern, and urged shareholders to support its nominations and plan for the Company. **Notably, Camac also nominated Daniel Katz ("Katz"), the managing partner of Katz Properties Retail ("KPR"). KPR is an affiliate of KPR Centers LLC, one of the Grocery Anchored Purchasers.**

70.     In other words, within just a few days, **three** significant Cedar shareholders publicly challenged the Company's governance and launched proxy contests.

71.     On March 2, 2021, Cedar issued a press release, entitled *Cedar Realty Trust Comments on Recent Public Announcements*, to announce that the "Board had formed a special committee to commence a strategic review process and was actively exploring a sale of the Company at a price of approximately $25 per share (adjusted for the Company's recent reverse stock split," and that "certain Camac Partners' director nominees participated directly" in this process, which was "disrupted due to the outbreak of the COVID-19 pandemic."[6]

---

[6]     Upon information and belief, Katz was the "certain Camac Partners' director nominees" who "participated directly" in the prior process.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 28 of 53 PageID #: 35

72.    No doubt concerned that a public proxy fight would impact their professional and financial interests, from early March 2021 through late April 2021, the Board and members of Company management, with the assistance of BofA Securities, engaged in multiple discussions with each of Barington, Camac, and Ewing Morris relating to the terms of potential mutually agreeable cooperation agreements. On April 28, 2021, the Company entered into agreements with each of Camac, Ewing Morris, and Barington, pursuant to which all the prior director nominations were withdrawn and the Board agreed to expand the size of the Board from seven members to ten members and appoint Defendants Morris, Ross, and Stern to the Board.[7] Also in connection with entering into these agreements, Roger Widmann, chairman emeritus of the Board, and Pamela Hootkin, chair of the Compensation Committee of the Board, notified the Board that they would retire from the Board at the Company's 2021 annual meeting of stockholders, following which the size of the Board would be decreased to eight directors.

73.    On June 3, 3021, the Company's management reported to the newly constituted Board that, with the Company's stock then trading for approximately $14 per share, the liquidation value of the Company, if successfully executed, might be as high as $28 or $29 per share. The Board then directed Defendants Schanzer and Gonsalves to obtain a report from BofA Securities on the possible orderly liquidation of the Company versus an outright sale. As noted above, a liquidation would trigger the Liquidation Preference.

74.    On June 6, 2021, Schanzer and Gonsalves met with BofA Securities to discuss a potential liquidation strategy versus a whole-company sale alternative. According to the Proxy, "[t]he possibility of selling assets in large portfolio sales, rather than individually, was also

---

[7]    Notably, Morris was appointed to serve on the Nominating and Corporate Governance and Compensation Committees of the Board, Ross was appointed to serve on the Nominating and Corporate Governance and Audit Committees of the Board and Stern was appointed to serve on the Compensation and Audit Committees of the Board.

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

discussed as a way of minimizing execution risk and shortening the overall timeline of returning cash to shareholders." It was unclear from the Proxy the genesis of this alternative, but, considering the timing, it appears to have been a calculated attempt to structure a transaction so as to avoid a traditional liquidation, and thus, to deny the Liquidation Preference to the Preferred Stockholders.

75.    During a July 15, 2021 Board meeting, "Schanzer presented a proposed dual-track strategic process that would include pursuing a so-called 'asset sale/remainco' strategy in tandem with a traditional whole-company sale process," and the Board authorized management to interview brokers for the possible sale of discrete asset pools.

76.    On July 28, 2021, the Board convened with management and its advisors, reviewed certain preliminary financial forecasts prepared by Company management concerning the Company's future operating performance, and discussed the possibility of restarting the strategic alternatives process. Following discussion, the Board determined to restart the strategic alternatives process on a "dual track" basis, which involved offering potential buyers a range of options, including a sale or merger involving the entire Company or, alternatively, the sale of the Company's core grocery-anchored shopping center portfolio (the "Grocery Anchored Portfolio") and its mixed-use redevelopment projects. The Board also engaged Jones Lang LaSalle Americas, Inc. ("JLL") to act as the Company's real estate advisor with respect to the potential sale of the Grocery-Anchored Portfolio and CBRE Group, Inc. ("CBRE") to act as the Company's real estate advisor with respect to the potential sale of the redevelopment projects.

77.    On August 3, 2021, the Board met with representatives of management, BofA Securities, JLL, and CBRE to kick off the dual-track process.  Therein, they discussed possible strategies with respect to the balance of the Company's assets (referred to in the Proxy as "Remainco") in the event the Grocery-Anchored Portfolio and redevelopment assets were sold in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

discrete asset sale transactions. Remainco was expected to own 19 stabilized shopping center assets, which had generated aggregate cash net operating income of approximately $19.1 million in 2021.[8] The options discussed included maintaining Remainco as an ongoing public company, possibly in an externally managed structure, to adopt a plan of liquidation for Remainco, or to seek counterparties for a potential transaction involving Remainco or its assets. The Board authorized the Company management team and advisers to make outreach to potential counterparties to a Remainco transaction.

78.     On September 9, 2021, Cedar announced that it was engaging a "dual-track process" to review the Company's strategic alternatives in order to maximize shareholder value, pursuant to which Cedar would explore, among other alternatives, a potential sale or merger involving the entire Company, and alternatively the potential sale of its Grocery Anchored Portfolio and its mixed-use redevelopment projects. Notably, Defendant Schanzer promised to maximize value for "all shareholders" (i.e. both common shareholders and the Preferred Stockholders):

> [w]e believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. ***The Board is committed to maximizing value for all our shareholders*** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

As described below, this was just lip-service and the interests of the Company insider common stockholders controlled the Board's deliberations.

79.     From September 7, 2021 through October 23, 2021, BofA Securities, JLL and CBRE solicited 55 potential counterparties, including other shopping center REITs, private real estate funds, real estate investors and financial sponsors.  Thirty-six parties proceeded to sign non-

---

[8]     By comparison, the Company reported "Same-Property Net Operating Income" of $68,084,000 for 2021.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

disclosure agreements with the Company. The non-disclosure agreements included non-disclosure and standstill provisions.

80.     By October 23, 2021, the Company had received two preliminary bids for the Company as a whole, two preliminary bids for the Grocery-Anchored Portfolio, and one non-conforming bid for a select number of Remainco assets. Of the whole Company bids, one was from Party A, a private real estate investment firm, for $21.90 per share in cash, and the other from Party B, a private owner and operator of retail real estate, for $23.00 per share in cash. The non-conforming bid was from Party C, a private commercial real estate investment firm, and proposed to acquire a portfolio of 16 (of 19) Remainco assets for a total cash purchase price of $200.0 million. For the Grocery-Anchored Portfolio, one of the bids was from DRA Advisors and certain of its affiliates, for $810.0 million in cash, and the other bid was from Party D, a group of private investors and financing parties, for $965.0 million.

81.     Over the next several weeks, the Company worked toward a transaction, requesting best and final bids by January 21, 2022. Indeed, the Company's process letter noted that Company did not anticipate entering into a definitive agreement that was subject to any due diligence or financing contingencies and that any final proposal containing such contingencies would be materially disadvantaged. Likewise, in subsequent oral conversations during December 2021 and January 2022, the Company advised each potential bidder that it anticipated "public company style" definitive agreements, in the sense that there would be no earnest money deposit that would serve as liquidated damages, no post-signing due diligence period, no non-customary conditions, and no survival of representations and warranties.

82.     Throughout December 2021 and January 2022, the Company and its advisors continued to engage in discussions with various potential counterparties. Notably, according to the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Proxy, "[o]n January 19, 2022, representatives of Wheeler met with [Defendant] Schanzer to discuss a potential transaction with respect to RemainCo." This was the *first* mention of Wheeler in the Proxy's "Background of the Transactions" narrative, and there was no information concerning the genesis of this meeting. Nevertheless, a non-disclosure agreement was signed two days later, and Wheeler was thereafter provided diligence information.

83.     On January 21, 2022, the Company received two proposals for potential whole-company transactions. Party A proposed a go-private transaction at a gross cash purchase price of $25.75 per share, not including certain contemplated reductions for "leasing capital and other identified items, such that the effective net offer price per share was as much as $2-$3 per share below the gross offer price." Party C proposed to acquire all of the Company's assets other than the redevelopment assets in an asset purchase transaction, for an aggregate cash purchase price of $1.05 billion, which valued the Grocery-Anchored Portfolio at $810.0 million and Remainco at $240.0 million. Party C also proposed to acquire either only the Grocery-Anchored Portfolio or Remainco at their stated valuations. The Company received a further updated proposal from the Grocery-Anchored Purchasers, providing for the purchase and sale of the Grocery-Anchored Portfolio for an aggregate cash purchase price of $870.0 million. Each of the proposals was non-binding, subject to completion of confirmatory due diligence and certain other conditions and contingencies.

84.     On January 24, 2022, the Company received a non-binding letter of intent with respect to Remainco from Party E. The proposal contemplated a reverse merger transaction with legacy Company stockholders retaining approximately 5% of the surviving entity and all shares of the Company Preferred Stock being exchanged for identical shares of preferred stock in the surviving entity. The consideration to be received by legacy Company stockholders in the merger

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 33 of 53 PageID #: 40

was valued in Party E's proposal at $8.10 per share. Party E's proposal contemplated that the Company's Preferred Stock would remain outstanding following the completion of the transaction as preferred stock of the surviving entity in the merger transaction. Party E's proposal did not include a property that was subsequently included in the Remainco asset pool, which would have likely increased the value of Party E's offer proportionally.

85.     On January 27, 2022, just six days after signing the non-disclosure agreement with Wheeler, the Company received a non-binding term sheet from representatives of Wheeler with respect to Remainco, which term sheet contemplated the acquisition of Remainco by Wheeler in an all-cash transaction for consideration payable to Company stockholders in an amount equal to $284 million, less the aggregate accrued liquidation preference of the Company Preferred Stock of $160.1 million and less retained liabilities, including the Company's transaction expenses, debt financing costs, deferred compensation liabilities and employee severance and change of control payments. This translated into a proposed per share consideration to Company common stockholders of approximately $9.40 per share, assuming no retained liabilities. Wheeler's proposal also contemplated that the Company's Preferred Stock would remain outstanding following the completion of the transaction as preferred stock of the surviving entity, and that the Company Preferred Stock would not be exchanged for preferred stock in Wheeler in the merger transaction.

86.     The following day, on January 28, 2022, the Board and Company management met with the Company's advisors and discussed the various proposals. It was noted that

> the options available to the Board arising from the process included pursuing a traditional whole-company merger transaction with Party A or a "sum of the parts" series of transactions with the Grocery-Anchored Purchasers, buyers of the redevelopment assets and any of Party C, Party E or Wheeler for Remainco and its assets. On one hand, it was noted that based on the bids received, the per share

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

value of Party A's whole-company proposal of $25.75, after accounting for the $2-$3 per share in deductions specified in their offer letter, was considerably below that of a "sum of the parts" series of transaction assembled from the other bids, which could result in aggregate value to shareholders of approximately $29.00 per share or more. On the other hand, a single transaction with a single credible buyer provided greater certainty of closing than a series of related transactions with multiple counterparties. Likewise, while a single merger transaction could close promptly after Company stockholders voted to approve the transaction, the series of related "sum of the parts" transactions was likely to close on a more elongated schedule to accommodate the various asset transfers and multi- party process. It was further noted that the risk of one or more redevelopment asset sales not closing on time was a risk applicable to both a whole-company and "sum of the parts" transaction.

87.    At the same meeting, the Board also discussed the parties' progress on the transaction documents. Party A's mark-up of the merger agreement complied with the Company's request and "was in the spirit of a customary public-company transaction as desired by the Company and did not appear to include any non-customary covenants, conditions or termination rights," whereas the asset purchase agreement markup provided by the Grocery-Anchored Purchasers "continued to retain several key provisions that were inconsistent with public-company transactions, including non-customary closing conditions, liquidated damages and survival of representations." Also, Party A and the Grocery-Anchored Purchasers had requested additional time to complete additional diligence, and the Board determined to extend the timeline for receiving final definitive bids for a further three-week confirmatory due diligence and negotiation period. The Board further instructed JLL and Company management to communicate to the Grocery-Anchored Purchasers that the Company would only enter into a "public-company style" asset purchase agreement for the Grocery-Anchored Portfolio, including limited contingent purchase price adjustments, no non-customary closing conditions, no liquidated damages provision and no post-closing survival of representations.

88.    On January 31, 2022, following discussions with JLL and Company management,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Grocery-Anchored Purchasers submitted a revised proposal that removed references to non-customary closing conditions, liquidated damages and survival of representations, and *lowered* the aggregate purchase price to $830.0 million.

89.     Then, on February 2 and 3, 2022, "in order to induce the potential counterparties to remain engaged in the process with the aim of providing the Company with final and fully-financed proposals by the end of the extended diligence period, the Board authorized the Company to enter into expense reimbursement letters with each of Party A, the Grocery-Anchored Purchasers, Party E and Wheeler, providing for the Company's reimbursement of these parties' documented out-of-pocket incremental expenses incurred during the extension period, up to stipulated amounts."

90.     On February 11, 2022, Party A adjusted its indicative net offer price down to $23.07 per share due to real estate valuation adjustments primarily to account for committed capital and leasing costs.

91.     As the Company continued to negotiate a transaction, on February 25, 2022, the Board and management convened to discuss the process and proposals. Therein, according to the Proxy, it was noted that

> the current proposals for the "sum of the parts" transactions consisting of the sale of the Grocery-Anchored Portfolio and redevelopment assets, followed by a Remainco merger on the terms proposed by Wheeler, continued, in the aggregate, to present a substantially higher value per share for the Company's common stockholders than a whole-company transaction, particularly now that Party A's whole-company bid had been reduced to $23.07 per share. The Board also took note that pursuant to the terms of the draft merger agreement submitted by Alston & Bird on behalf of Wheeler, the Company Preferred Stock would remain outstanding as preferred shares of the surviving entity and would not be exchanged for preferred shares of Wheeler, which meant that immediately following the proposed merger transaction, the Company Preferred Stock would remain senior to Wheeler and all of Wheeler's securityholders with respect to the cash generated from the Remainco assets, which in the fiscal year ended December 31, 2021 was in excess of $19 million, as compared to the annual aggregate dividend on the Company Preferred Stock of approximately $10.8 million.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

92.     Also at this meeting, the Company's counsel fielded questions from the Board **about the rights and obligations of the Company under the terms of the articles supplementary governing the terms of the Company Preferred Stock**. At the conclusion of the meeting, the Board instructed BofA Securities to advise Party A that the Board was unlikely to agree to pursue a transaction with Party A unless Party A raised its offer price significantly. The Board further instructed its advisors and Company management to continue engaging with the Grocery-Anchored Purchasers and Wheeler to finalize terms and definitive agreements with respect to the proposed "sum of the parts" transactions in a way that minimized, to the maximum extent possible, any remaining uncertainties or contingencies with respect to the respective purchaser parties' obligations under the applicable agreements.

93.     On February 27, 2022, representatives of Party A notified the Company that it would increase its whole-company offer per share to $26.00, and that it would assume the risk that the sale of one of the redevelopment assets would not occur prior to closing of the proposed merger. Importantly, Party A's go-private proposal would have triggered the Redemption Right and Conversion Right for the Preferred Stockholders.

94.     Later on February 27, 2022, at the direction of the Board, Company management spoke with representatives of the Grocery-Anchored Purchasers via telephone and advised that a revised whole-company offer had been received by the Company at a valuation that was now only slightly lower than the aggregate value of a "sum of the parts" transaction, a discount that the Board could consider appropriate in exchange for the greater certainty of closing. On February 28, 2022, the Grocery-Anchored Purchasers raised their proposed purchase price for the Grocery-Anchored Portfolio to $840.0 million and agreed to backstop the Company's planned sales of two redevelopment projects by agreeing to acquire them for up to $80.5 million to the extent either of

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 37 of 53 PageID #: 44

these redevelopment assets had not been sold by the time of closing of the Grocery-Anchored Sale.

95.     Later on February 28, 2022, the Board and Company management met with their advisors to review and discuss the proposals. According to the Proxy, the Board "weighed the benefits of the higher aggregate value per share receivable by the Company's stockholders in a "sum of the parts" transaction versus the perceived lesser complexity and greater certainty of closing in the proposed whole-company transaction." Then, "[m]embers of the Board expressed their view that while they might consider a slight discount in exchange for greater certainty of closing, they were not prepared to accept a significant discount that would meaningfully reduce the transaction consideration to be received by the Company's **common** stockholders" – *i.e.*, themselves.[9] **In other words, the Board was fine letting the Preferred Stockholders get railroaded, as long as they got more money.** The Board instructed management to seek a higher offer from Party A; Party A declined to do so.

96.     A few days later, on March 2, 2022, Cedar announced that its process had culminated in definitive agreements for the sale of the Company and its assets in a series of related all-cash transactions (previously defined as the "Transactions"):

(i)      an agreement to sell a portfolio of 33 grocery-anchored shopping centers to a joint venture between a fund managed by DRA Advisors and KPR for $840.0 million;

(ii)     an agreement to sell the Revelry development project to an undisclosed third party for $34.0 million and the pending negotiation of sale of the

---

[9]      As of April 19, 2021, the Company's directors and executive officers collectively owned 7.1% of the Company's outstanding common stock. Moreover, Ewing Morris and Camac owned 8.1% and 5.1%, respectively, of the Company's outstanding common stock, and appointed three of the eight members of the Board following their 2021 activist campaigns. Upon information and belief, only one Defendant owned a *de minimis* amount of Preferred Stock.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

NorthEast Heights redevelopment project for $46.5 million (the DRA-KPR joint venture also agreed to acquire these projects at the aggregate price of $80.5 million in the event the third-party sale did not close before the grocery-anchored shopping center portfolio sale); and

(iii)   an agreement to sell Cedar and its remaining assets to Wheeler after completion of the above-described transactions, in an all-cash merger transaction purportedly **valuing the assets at $291.3 million.**

97.    Together, the transactions, which were unanimously approved by the Board, were estimated to generate total net proceeds of more than $29.00 per share of Cedar *common* stock, to be distributed to Cedar's *common* stockholders upon completion.

98.    **Pursuant to the agreement with Wheeler, the Preferred Stock would remain publicly traded under their current ticker symbols.**

99.    Following the announcement of the Transactions, the trading price of the Company's Preferred Stock plummeted: Cedar Series C preferred stock fell to $9.85, down 57% from its previous day close at $22.85.  Cedar Series B preferred stock likewise fell from a prior close at $25.61 to $12.95.

100.    On May 27, 2022, Cedar's common stockholders voted in favor of the Transactions:

**Proposal 1 - The sale of the Company and substantially all of its assets.** To approve the sale by the Company of a portfolio of 33 grocery-anchored shopping centers to DRA Fund X-B LLC and KPR Centers LLC, followed by the subsequent merger of the Company with a wholly-owned subsidiary of Wheeler. Stockholders voted as follows:

| | |
|---|---|
| For: | 9,411,048 |
| Against: | 19,556 |
| Abstain: | 2,816 |

Accordingly, Proposal 1 was approved.

101.    On July 7, 2022, the Company completed the Grocery-Anchored Portfolio Sale (including the redevelopment assets) for gross proceeds of approximately $879 million, including

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1
INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW Document 1-1 Filed 11/14/22 Page 39 of 53 PageID #: 46

the assumed debt.

102. On August 9, 2022, Cedar's Board declared the $29.00 per share Closing Dividend to be paid to the Company's common shareholders.

103. On August 22, 2022, the Wheeler Merger was consummated. As noted above, in connection with the Wheeler Merger, Cedar, Wheeler, and Cedar OP executed the $130 million Keybank Loan agreement, collateralized by the Wheeler Properties, and the Guaranty – whereby Cedar and Wheeler guaranteed Cedar OP's obligations under the Loan.

104. Notably, it appears that the Keybank Loan requires Cedar OP to maintain "a Collateral Pool Leverage Ratio . . . of not more than fifty-five percent" based on the "Aggregate Appraised Value of the Collateral Properties" as determined by Keybank. **Accordingly, it appears that Keybank valued the Wheeler Properties at $236.4 million (_i.e.,_ $130 million/0.55) and <u>not</u> the $291.3 million touted by Cedar and Wheeler in public filings regarding the Transactions.**

### III. <u>The Preferred Stockholders Rights Have Been Materially and Adversely Affected</u>

105. In connection with the Transactions, Cedar sold its most lucrative assets, and thereafter transferred control over the payment of future Preferred Stock dividends to Wheeler, a company with a history of underperformance, dysfunctional management, and oppression of its own preferred shareholders.

106. Indeed, as noted above, in late 2017, the Board explicitly acknowledged Wheeler's "underperformance," "uncertain dividend sustainability," "lower-quality portfolio," and over-leveraged balance sheet. And, in March 2021, certain holders of Wheeler's Series D preferred stock filed suit against Wheeler and certain of its current and former directors and officers alleging that, in 2018, Wheeler breached the articles supplementary governing their preferred shares by

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

unilaterally amending the provisions of the articles in "an attempt to avoid the mandatory redemption" of the preferred shares "triggered by Wheeler's failure to maintain sufficient net assets over obligations to its [p]referred [s]hareholders."[10] In December 2018, Wheeler suspended dividends for its Series A, B, and D preferred stock; on November 3, 2021, Wheeler's common stockholders voted to amend the company's charter to remove the cumulative dividend rights of the Series A and Series B preferred stock. Dividends remain outstanding on Wheeler's Series D preferred stock, and, as of February 2022, Wheeler "can provide no certainty as to when or if dividends will be reinstated."[11]

107.    Market analysts similarly observed the destruction in the investment quality of Cedar's Preferred Stock. For example, a *Seeking Alpha* article published on March 15, 2022 entitled *Take a Shower After Reading the Wheeler/Cedar Merger*, aptly stated:

> Cedar common shareholders come out ahead with total payments of $29 per share. …**Cedar preferreds, although significantly cheaper than they were pre-merger are dangerous investments** and I would be inclined to sell if I had any, which thankfully I don't. **Wheeler does not have enough cashflowing assets to finance the preferred dividends alongside their mountain of debt and the pre-existing WHLR preferred dividends.**

> Wheeler preferred B appears to be worse off after the M&A than it was before. No common equity was added beneath it but $130 million of debt was added above it with the Keybank loan that Wheeler took on to finance the merger. **The $161**

---

[10]     *See JCP Investment Partnership, LP, et al v. Wheeler Real Estate Investment Trust, Inc.*, No. 21-cv-00729 (D. Md.). The individual officer/director defendants filed a motion to dismiss, which was denied. Upon information and belief, this litigation has been stayed pending mediation. Similarly, in October 2021, certain other stockholders of Wheeler filed an action, entitled *Steamboat Capital Partners Master Fund, LP and Steamboat Capital Partners II, LP v. Wheeler Real Estate Investment Trust, Inc.*, in Maryland circuit court, alleging a rights offering of convertible debt to the Wheeler's common stockholders, and the notes issued pursuant to the rights offering, breached the provisions of the Wheeler's governing documents and violated the rights of the holders of Wheeler's Series B and Series D preferred stock.

[11]     Wheeler was also, in 2019, the target of activists who launched a proxy contest, prevailed and obtained seats on the Wheeler board, and Wheeler has since undergone *two* contentious changes in leadership, resulting in a substantial decline in market value.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 41 of 53 PageID #: 48

RECEIVED NYSCEF: 10/14/2022

**million of Cedar preferreds will now be pari passu with the WHLR preferreds which reduces the waterfall value in the event of partial payoff in a liquidation.**

108.    Indeed, unless amended and/or refinanced, the $130 million Keybank Loan is set

to mature on August 22, 2023, at which time the Loan must be paid in full. The Wheeler Properties

generated *just* $19.1 million in net operating income in 2021, and it is therefore very unlikely that

Cedar OP / Surviving Company will be able to cover its obligations under the KeyBank Loan *and*

the Preferred Stock dividend.[12]

109.    What is more, the Articles Supplementary do not provide Preferred Stockholders

with a mandatory redemption right.[13] Therefore, Preferred Stockholders could not compel Cedar

---

[12]    Wheeler likewise faces its own looming liquidity crisis, as disclosed in its August 9, 2022 Form 10-Q:

> Beginning on September 21, 2023 . . . holders of the Series D Preferred . . . will have the right to cause the Company to redeem their Series D Preferred at a price of $25.00 per share plus the amount of all accrued but unpaid dividends. . . . **As of June 30, 2022, the outstanding Series D Preferred had an aggregate liquidation preference of approximately $78.81 million, with aggregate accrued and unpaid dividends in the amount of approximately $30.40 million.** As of June 30, 2022, the Series D Preferred is convertible, in whole or in part, at any time, at the option of the Series D Preferred Holders, into previously unissued Common Stock at a conversion price of $16.96 per share of Common Stock. Based upon the closing price of our Common Stock on August 8, 2022 of $2.23 per share, we believe it unlikely that Series D Preferred Holders would convert their shares of Series D Preferred into Common Stock in advance of the Series D Redemption Date and would instead choose to exercise their redemption rights on or after the Series D Redemption Date. **The Company further believes that it is unlikely that on the Series D Redemption Date the Company will have sufficient available cash to pay the aggregate redemption price in cash. Accordingly, the Company would not be able to meet our redemption obligation without either liquidating assets or issuing significant additional amounts of Common Stock.**

[13]    Rather, Cedar had the *option* to redeem the Preferred Stock. Section 5(b) of the Series C Articles Supplementary provided:

> On or after August 24, 2022 the Corporation, at its option, upon giving notice as provided below, may redeem the Series C Preferred Stock, in whole or from time to time in part, for cash, at a redemption price of $25.00 per share, plus all accrued

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)        INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW    Document 1-1    Filed 11/14/22    Page 42 of 53 PageID #: 49

to redeem the Preferred Stock prior to the Transactions, and, likewise, cannot compel Wheeler to redeem the Preferred Stock following the Transactions.

110.    Thus, following the Transactions, the Preferred Stockholders are at the mercy of Wheeler 's officers and directors, who themselves have been shrouded in controversy and have for years avoided paying dividends to Wheeler's preferred shareholders. Moreover, the absence of a mandatory redemption right and the destruction of the Preferred Stock investment value as a result of the Transactions has positioned Wheeler to let the Preferred Stock languish, and/or – at its discretion and should funding become available – acquire the Preferred Stock at significantly depressed prices through future tender offers and/or open market purchases. Alternatively, should Cedar OP / Surviving Company / Wheeler default on the Loan, the loss of equity in the Wheeler Properties will be borne by the Preferred Stockholders.

## IV.    The Transactions Were the Result of a Conflicted and Unfair Process

111.    In negotiating the Transactions, the Individual Defendants breached the contractual and fiduciary duties they owed to the Preferred Stockholders by structuring the Transactions so that almost all of the assets were sold to the privately held joint venture managed by DRA Advisors and KPR and the Company itself was "sold" to Wheeler to avoid paying the Liquidation Preference and Conversion Right contractually owed to the Preferred Stockholders upon an actual dissolution or change of control.

112.    Indeed, and for its part, Wheeler eagerly complied and aided in the Individual Defendants' breaches, assumed the Preferred Stock in an effectively *risk-free* exchange for the

---

and unpaid dividends on such Series C Preferred Stock to, but not including, the date of redemption, whether or not declared (the "Optional Redemption Right").

The Optional Redemption Right for the Series B Preferred Stock commenced on May 22, 2017. Cedar also had the *option* to redeem the Preferred Stock upon a change of control.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Wheeler Properties (with the Preferred Stockholders assuming the risk of default under the Keybank Loan), well aware that Cedar's Preferred Stockholders had no recourse or redemption rights, and that following the Transactions, Wheeler could potentially scoop up the Preferred Stock at further discounted prices.

113.    As a result of Defendants' machinations, Preferred Stockholders were not entitled to vote on the Transactions, receive the Liquidation Preference, or exercise the Conversion Right. What is more, as the Proxy made clear, the Board deliberately went out of its way to structure a transaction that paid a premium to the common stockholders – including Company insiders – and avoided paying the Liquidation Preference or Redemption Right; the Board secured a fairness opinion focused *exclusively* on the common stockholders; and, throughout the process, the Preferred Stockholders did not have anyone advocating for their interests during the negotiations of the Transactions.

114.    A *Seeking Alpha* article published on March 15, 2022, entitled *Take a Shower After Reading the Wheeler/Cedar Merger*, appropriately stated that Preferred Stockholders were having "their collateral stripped out from under them," further explaining:

> Wheeler is a tiny company at a market cap of $20 million so it takes quite the maneuver for them to acquire Cedar which has just over a billion in real estate.

> While Wheeler is buying CDR they are not getting a majority of the assets. 33 of Cedar's shopping centers are going to a joint venture managed by DRA Advisors and KPR centers in exchange for $840.  2 of Cedar's most promising redevelopment projects are going to Northeast Heights for a combined $80.5 million.

> Wheeler's consideration in the deal is $291.3 million which I believe consists of $130 million in cash from a fresh Keybank loan and assumption of just over $160 million of CDR preferreds.

> **The danger of non-voting shares**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Prima facie, preferreds have superior rights to common in that they come first in the waterfall and their dividends must be paid in full before the common can get a dividend. However, preferred shares do not have voting rights in most cases which makes them susceptible to financial trickery.

When a cumulative preferred dividend goes unpaid, it accrues and adds to the liquidation preference which a preferred holder is owed. In theory, this should make it more valuable over time as the liquidation preference continues to rise, but what happens if the dividend is just never paid?

It is a move referred to as a cram down – where it is clear to preferred holders that the company has no intent or perhaps ability to ever pay the dividend. Accrual doesn't mean much if you are never going to get paid and so the market price tends to collapse when this happens.

***Although not formally stated in any company documents, I believe this is what just happened to the Cedar preferreds and what has already happened to the WHLR preferreds which have already been accruing unpaid dividends for years***.

Cram down's such as this come with a huge reputational cost to the company. It nearly eliminates the ability of the company to raise future equity of either common or preferred because of the damaged trust. In this case, however, WHLR already had a severely bruised reputation due to a history of destroying shareholder value and the accumulating accrual of dividends on the Wheeler preferreds.

[***]

## The ugliest of value creation

Cedar has been attempting to sell itself as part of its strategic review and it seems they have finally found a way to unlock significant value for the common.

If we look at the whole Cedar waterfall, they had assets of a certain value and that value was supposed to pay the debt and the preferreds with the remainder going to the common.

But what if this $161.25 million [owed in a dissolution to the holders of] preferred could be detached from the quality assets, set aside and nearly all of its value removed? The more could trickle down to the common.

I have no way of knowing the intent of the companies or what was premeditated versus just how it played out, but this is potentially for the way in which the merger with WHLR was structured.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 45 of 53 PageID #: 52

*It is extremely dirty and I don't condone it*, but I'm not here to pass judgment.

**V.    The Board and Cedar Breached Their Contractual and Fiduciary Duties to the Preferred Stockholders, and Wheeler Interfered With Preferred Stockholders' Contractual Rights and Aided and Abetted the Board's Breaches**

115.    In the event of any dissolution or liquidation, Cedar was required to pay the Preferred Stockholders the Liquidation Preference. Similarly, in the context of a change of control sale to a private buyer, Cedar was obligated to allow the Preferred Stockholders to exercise the Conversion Right and convert their preferred stock into common stock at a ratio pursuant to which they would effectively receive the liquidation preference of $25.00.

116.    The Transactions were effectively a dissolution or change of control because the assets that were integral and essential to Cedar's operations were sold to the privately-held DRA-KPR joint venture. Moreover, in connection with the Transactions, Cedar (i) discharged all of its debts, liabilities, and obligations, (ii) terminated its Board, and all executive officers and employees, (iii) distributed all of the net proceeds from its asset sales to common stockholders, (iv) canceled all of its common stock, and (v) substituted its charter and bylaws with Wheeler's charter and bylaws.

117.    A sale of virtually all of a corporation's assets – or even a sale of only "a part thereof so integral as to be essential for the transaction of its ordinary business" – may be construed as a "practical dissolution." *Warner v. Fitzgerald*, 56 A.2d 827, 833 (Md. 1948) ("such a sale is wholly or partly an act of self-destruction and a practical dissolution without compliance with law"); *see also Boomer v. Rowe*, 249 F. 946, 950 (9th Cir. 1918).

118.    Further, even if *arguendo* the Transactions did not constitute a dissolution or change in control, by structuring the Transactions to favor the common stockholders like themselves and the institutional funds that they represented at the obvious expense of the Preferred

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1                                                              INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 10/14/2022

Stockholders, the Defendants breached the contractual duty of good faith and fair dealing.  *Cf., LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 440-41 (Del. Ch. 2010) ("The bottom line right of the preferred stockholders in a merger, therefore, is not tied to its healthy liquidation preference or the company's mandatory conversion strike price – it is simply the right to convert the shares into common stock at the Conversion Formula and then be treated *pari passu* with the common.").

119.    Defendants also breached the fiduciary duties of loyalty, good faith, and care to Cedar's Preferred Stockholders by elevating the common stockholders at the expense of the Preferred Stockholders.  *E.g., Dart v. Kohlberg, Kravis, Roberts & Co.*, C.A. No. 7366, 1985 Del. Ch. LEXIS 416, at *13-14 (Del. Ch. May 6, 1985) ("[I]nequitable action does not become permissible simply because it is legally possible….The assets of the corporation were used as sole security for the loans obtained for the purpose of buying out the common stock and the public preferred stockholders were left holding their shares in a corporation which, as a result of the transaction, has a much greater debt and therefore perhaps a lessened ability to pay preferred dividends. Such a leveraged buy-out calls for judicial scrutiny to prevent possible abuse.").

120.    For its part, Wheeler was aware of Preferred Stockholders' contractual rights and the fact that the Board owed fiduciary duties to Preferred Stockholders, yet it actively worked with the Board to structure the Transactions in order to enrich itself and the Board and harm the Preferred Stockholders and interfere with their contractual rights. Wheeler positioned itself to acquire the Wheeler Properties at a price far below their fair market value, and it thus agreed to help the Board breach their contractual obligations and fiduciary duties to Preferred Stockholders.

## VI.    <u>The Prospectus Was Materially False and Misleading</u>

121.    In addition to the Defendants' deliberate efforts to deny Plaintiff and the Class their contractually guaranteed Liquidation Preference and Conversion Right, Defendants' conduct in

43

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

structuring the Transactions rendered the Prospectus materially false and misleading, constituting

a further breach of the Individual Defendants' fiduciary duties.

122.    As noted above, the Prospectus for the Series C Preferred Stock provided that

holders of Series C Preferred Stock had no voting rights, except

> **the affirmative vote of the holders of at least two-thirds of the outstanding Series C Preferred Stock (voting as a separate class) is required for [the Company]** to authorize, create or increase the authorized or issued amount of any class or series of our equity securities ranking senior to the outstanding Series C Preferred Stock as to dividends and amounts upon liquidation or **to amend our charter (whether by merger, consolidation or otherwise), in a manner that materially and adversely affects the rights of the holders of the Series C Preferred Stock, unless the Series C Preferred Stock remains outstanding with its terms materially unchanged or, if the Corporation is not the surviving entity, the Series C Preferred Stock is exchanged for a security of the surviving entity with terms that are materially the same as the Series C Preferred Stock.**

123.    According to the March 2, 2022 Agreement and Plan of Merger with Wheeler,

Section 2.4 Governing Documents; Directors and Officers.

(a) **From and after the Effective Time, the charter of [Wheeler], as in effect immediately prior to the Effective Time, shall be the charter of the Surviving Company** until thereafter amended as provided therein or by applicable Law. The bylaws of [Wheeler], as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Company until thereafter amended as provided therein or by applicable Law.

124.    In connection with the Transactions, and as stated in the Proxy, Preferred

Stockholders were not entitled to vote on the Transactions despite the fact that, following the

Wheeler Merger, the charter of Wheeler became the charter of the Surviving Company.

## **CLASS ACTION ALLEGATIONS**

125.    Plaintiff brings this action on his own behalf and as a class action pursuant to NY

CPLR, Art. 9, on behalf of all holders of Cedar Preferred Stockholders who were harmed by the

Defendants' actions described above (the "Class"). Excluded from the Class are the Defendants

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 10/14/2022

Case 2:22-cv-06945-DLI-JMW   Document 1-1   Filed 11/14/22   Page 48 of 53 PageID #: 55

herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

126.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of December 31, 2021, there were approximately 6,450,000 shares of Cedar Preferred Stock issued and outstanding, which were held by individuals and entities dispersed across the country.

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including:

i)     whether Cedar and the Board breached their contractual duties with respect to Plaintiff and the other members of the Class in connection with the Transactions;

ii)     whether the Board breached their fiduciary duties of loyalty, due care, and good faith with respect to Plaintiff and the other members of the Class in connection with the Transactions;

iii)     Whether Wheeler tortiously interfered with the Preferred Stockholders' contractual rights or aided and abetted this breach;

iv)     whether the Defendants, in bad faith and for improper motives, structured the Transactions for their own benefit at the expense of Plaintiff and the other members of the Class; and

v)     whether Plaintiff and the other members of the Class suffered damages.

45

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

c.      Plaintiff is an adequate representative of the Class, has retained competent

counsel experienced in litigation of this nature, and will fairly and adequately

protect the interests of the Class.

d.      Plaintiff's claims are typical of the claims of the other members of the Class

and Plaintiff does not have any interests adverse to the Class.

e.      A class action is superior to other available methods for the fair and efficient

adjudication of the controversy.

## CAUSES OF ACTION

### COUNT I
### (Against the Company and Board for Breach of
### Contract Under Maryland Law)

127.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

128.    As set forth above, Plaintiff and other members of the Class had a contractual right

to the Liquidation Preference upon a dissolution or the Conversion Right upon a change of control.

129.    Although Cedar and the Board effected a practical dissolution or change in control

by selling virtually all of the assets that were essential or integral to the operations of Cedar to the

privately-held joint venture, they deliberately structured the Transactions to avoid paying the

Liquidation Preference or affording the Preferred Stockholders their Conversion Right in

connection with the merger with Wheeler.

130.    Even assuming the Transactions did not effect a practical dissolution or change in

control, structuring the Transactions in this manner was a breach of the implied duty of good faith

and fair dealing.

131.    As a result, Plaintiff and the Class suffered damages, in an amount to be determined

46

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

at trial.

## COUNT II
### (Against the Individual Defendants for
### Breaches of Fiduciary Duties Under Maryland Law)

132.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

133.     As directors and/or officers of Cedar, the Defendants' fiduciary duties of good faith,

loyalty, and care required them to negotiate the Transactions without favoring themselves at the

obvious expense of the Preferred Stockholders, including by: (a) undertaking an appropriate

evaluation of Cedar's net worth as a merger/acquisition candidate; (b) taking appropriate steps to

enhance Cedar's attractiveness as a merger/acquisition candidate; (c) acting independently to

protect the interests of the Company's Preferred Stockholders; (d) adequately ensuring that no

conflicts of interest exist between the Defendants' own interests and their fiduciary obligations,

and, if such conflicts existed, to ensure that all conflicts were resolved in the best interests of

Cedar's stockholders rather than Defendants' own interests; and (e) refusing to approve the

Transactions as structured in order to harm one class of stockholders by favoring the common

shareholders at the expense of the Preferred Stockholders.

134.     As alleged herein, the Defendants breached their fiduciary duties to Plaintiff and

the Class.  The Defendants employed a strategic process and approved the Transactions' structure

that advanced their own personal interests.

135.     As a result of Defendants' breaches of their fiduciary duties of good faith, loyalty,

and care, Plaintiff and the Class suffered damages, in an amount to be determined at trial.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## COUNT III
### (Against Wheeler for Tortious Interference With Contractual Rights
### Under Maryland Law)

136.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

137.     The Articles Supplementary are a contract between Cedar and its Preferred Stockholders.

138.     As alleged above, Cedar and the Board have breached express provisions of the Articles Supplementary and the implied duty of good faith and fair dealing in connection with structuring and consummating the Transactions.

139.     Wheeler had knowledge of the contractual rights of Preferred Stockholders under the Articles Supplementary, and cooperated with Cedar and the Board to structure the Transactions with the intent of interfering with those contractual rights, and enriching itself, Cedar, and the Board at the expense of Preferred Stockholders. As a result of the Transactions, Wheeler positioned itself to acquire the Wheeler Properties at a price far below their fair market value. In exchange for this economic benefit, Wheeler agreed to participate in the Transactions, and to help the Board maximize their own payout from the Transactions.

140.     As a direct result of Wheeler's tortious interference with the contractual rights of Preferred Stockholders under the Articles Supplementary, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## COUNT IV
### (Against Wheeler for Aiding and Abetting the Board's Breaches of Fiduciary Duties
### Under Maryland Law)

141.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

142.     As alleged above, the Board breached fiduciary duties owed to Preferred Stockholders.

143.     Wheeler actively participated and cooperated with the Board in structuring the Transactions with the intent of enriching itself, Cedar, and the Board at the expense of Preferred Stockholders. Specifically, as a result of the Transactions, Wheeler positioned itself to acquire the Wheeler Properties at a price well below their fair market value. In exchange for this economic benefit, Wheeler agreed to participate in the Transactions, and to help the Board maximize their own payout from the Transactions.

144.     Wheeler knew that the Board owed fiduciary duties to Preferred Stockholders, and that its misconduct was aiding and abetting the Board in breaching its fiduciary duties.

145.     As a direct result of Wheeler's aiding and abetting the Board's breach of fiduciary duties, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Awarding Plaintiff and the Class money damages for all losses and damages suffered as a result of the wrongdoing alleged herein by the Defendants, plus pre-judgment and post-judgment interest;

C.     Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

D.     Granting such other and further relief as Plaintiff's and the Class's causes may require.

## JURY DEMAND

Plaintiff and the other members of the Class demand a trial by jury for the Counts above as to all issues so triable.

Dated: October 14, 2022

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**

Michael J. Palestina
Brian C. Mears
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
T: (504) 455-1400
F: (504) 455-1498
Email: michael.palestina@ksfcounsel.com
         brian.mears@ksfcounsel.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

  */s/ Juan E. Monteverde*
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com
          mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.